## Moss's Appeal.—Halsey's Appeal.

*Distribution of Balance in hands of the Surviving Trustee of the North American Land Company.*

I. In 1795, three persons, holding six millions of acres of land in various parts of the United States, entered into articles of agreement to convey the same to trustees for the use of those who should thereafter become purchasers and holders of shares in a land company, the land to be represented by thirty thousand shares; covenanting therein that the dividends on each share should not be less than 6 per cent. per annum, and that they would advance from time to time whatever might be required to enable the managers to pay this annual dividend, agreeing further to deposit their certificates of stock, with a power to sell, in the hands of the trustees, as security for the performance of this covenant. But about three-fourths of the land was in fact conveyed to the trustees, and only 22,365 certificates of stock issued, one-third to each of the founders. The unconveyed lands were sold or encumbered by the original holders, only a small part thereof being recovered for the use of the shareholders,. at a great expense, which was compensated by an agreement on the part of the original holders, dated April 22d 1800, that £20,000 should be deducted out of their dividends. They also deposited with the trustees 7455 shares of stock as security for the guaranteed dividends, which were subsequently sold and purchased for the benefit of the company; and subsequently 800 additional shares were released to the company. One of the original holders advanced to the company, from time to time, funds to pay accounts and dividends, all which was repaid to him except $7684.90, which was less than he had advanced on the dividend account. On the distribution of a fund in the hands of the surviving trustees, it was *Held,*

(1.) That the Statute of Limitations had no possible application to the cove-

nant guaranteeing the dividends; nor was there, under the circumstances, any legal presumption of payment to the stockholders arising from lapse of time; that the covenant imposed an annual recurring obligation, as immortal as the association, and that as it was a fundamental regulation of the association, created by its founders, entering into and making part of the contract with each of the shareholders, it was not avoided by long disuse and non-claim, or by the neglect of the managers to sue on it; and that therefore a distribution to the shares of stock retained by the original founders of the association, and held by their representatives, should be postponed until the other shareholders had received their guaranteed dividends in full.

(2.) That the sum advanced by one of the original members to pay dividends, could not be recovered back by his representatives, so long as the funds of the company were insufficient to pay the annual dividends guaranteed by him and his associates.

(3.) That the 7 unissued shares of the stock were not entitled to any dividends, so long as the sums expended by the company to redeem the lands which had not been conveyed to the trustees, and the $20,000 charged against the accruing dividends of the original holders, remained unpaid.

(4.) That the 7455 shares of stock which had been deposited with the trustees as security for the 6 per cent. dividends, and which were sold and purchased for the use of the company, as also the 800 shares that had been released to the company, were extinguished, and entitled to no share in the distribution.

(5). That, of the shares entitled to distribution, those which stand in the name of the original founders of the association should also be excluded, the dividend due thereon being more than overbalanced by the indebtedness of the holders.

(6.) That, as the article of agreement provided that a record should be kept of all transfers of stock, the auditor was right in distributing the fund among those who, by the books and certificates, appeared to be the legal owners of the certificates of stock, legally entitled to participate in the distribution, even though there was evidence that many of the holders were mere agents to sell for the original stockholders.

II. Where it appeared that one of the original stockholders had agreed, soon after the formation of the association, to sell to the other two his interest in the company, consisting of 10,000 shares, for $1,150,000, payable in drafts to be drawn on and accepted by the parties in one, two, and three years from date, the stock to be retained by the vendor until payment of or on part of the drafts, and to be transferred in proportion to the payments, the vendor to be kept indemnified against any claim for dividends for which the three had become responsible; and the vendor had subsequently conveyed his interest to another party, in trust for the holders of the acceptances given for the purchase-money, which were never paid, it was *Held*,

(1.) That the agreement to sell was merely executory, and its specific performance could not be properly enforced after so great a lapse of time.

(2.) That the second transfer in trust placed the trustee and his successor in the position of the grantor, and bound them to transfer the stock on payment of the acceptances.

(3). That the legal holders of the shares (claimed to be those which were transferred as above) did not hold them adversely to the persons to whom they were to be transferred under the above-mentioned executory agreement, but with a recognition of the rights acquired under it.

(4.) That the claimants under the executory agreement to transfer, have no such claim under the assignment which was subsequently made in trust for the holders of the acceptances, as to compel them to concede to said holders any greater rights than they would have had if the trust assignment had not been made.

(5.) That nothing short of a full compliance on the part of the claimants

with their contract (to wit, a payment of the acceptances given for the purchase-money), would entitle them to a decree for a specific performance; and that the agreement was in no sense a pledge of stock, to be recovered on proof that the debt for which it was pledged was presumed to be paid by lapse of time, or barred by the statute.

APPEAL from the Common Pleas of *Philadelphia.*

These were appeals by William S. Halsey, administrator, &c., and John Moss, from the decree of the Common Pleas, in the matter of the account of James Dundas and Benjamin Kugler, surviving trustees of the North American Land Company.

By certain articles of agreement made at Philadelphia on February 20th 1795, between the Honourable Robert Morris, John Nicholson, and James Greenleaf, of the one part, and those who should become purchasers, owners, or holders of shares in the North American Land Company, of the other part, recorded at Philadelphia in Deed Book No. 48, p. 277, it was agreed that an association should be formed by the name of The North American Land Company. The capital stock was to consist of six millions of acres of land in the states of Pennsylvania, Virginia, Kentucky, North Carolina, South Carolina, and Georgia, the titles to which were to be vested in Thomas Willing, John Nixon, and John Barclay, in trust, to convey the same according to the articles of agreement. This association was never incorporated.

Pursuant to these articles of association the company was formed, and on or before March 9th 1795, 22,365 shares of the stock were issued and disposed of to various persons by Messrs. Morris, Nicholson, and Greenleaf. By five separate deeds, dated respectively March 5th and 9th 1795, they granted to Messrs. Willing, Nixon, and Barclay, in trust for the company, 558,621¼ acres of land in Virginia, 431,043 acres of land in Kentucky, 217,619 acres of land in North Carolina, 957,238 acres of land in South Carolina, and 2,314,796 acres of land in Georgia, in all 4,479,317¼ acres, which, in the proportion of one share for every 200 acres as fixed in the articles of agreement, were represented by the 22,365 shares then issued. These deeds were recorded at Philadelphia. Mr. Willing refused the trust, but it was accepted by Messrs. Nixon and Barclay. The affairs of the company did not prosper, and the shareholders received little or no benefit therefrom.

By the 28th article of the original articles of agreement, provision was made for alterations therein whenever the same should be found necessary. Accordingly, at an annual meeting of the shareholders, held at Philadelphia December 31st 1806, it was deemed expedient to make certain alterations in the principles of the articles of agreement, and it was also proposed to add other articles thereto. These alterations were then and there

adopted by a large majority of shareholders, and at the next annual meeting thereafter in Philadelphia, held December 31st 1807, approved, ratified, and adopted by two-thirds of the whole number of shareholders and proxies then met, to wit, the holders or representatives of 17,132 shares, whereby the alterations became part of the articles, and bound all concerned therein.

Pursuant to the articles of agreement and amendments John Nixon, one of the trustees, by deed of April 27th 1808, recorded at Philadelphia, granted and conveyed to Henry Pratt, John Ashley, John Vaughan, Robert Porter, and John Miller, Jr., their heirs and assigns, as joint tenants and not as tenants in common, all his estate, right, title, and interest of, in, and to all the lands and premises so as aforesaid conveyed to him by Messrs. Morris, Nicholson, and Greenleaf, in trust for the company, Messrs. Pratt and others being the trustees named in said amendments to the original articles.

On April 30th 1838, Messrs. Vaughan and Porter, who had survived Messrs. Pratt, Ashley, and Miller, granted and conveyed all the said lands and premises of the company vested in them in law or equity unto Benjamin Tilghman, Esq., in trust, to convey the same unto John Vaughan, Robert Porter, James Dundas, Henry Nixon, and Benjamin Kugler, to hold upon the same trusts as they were held by Messrs. Vaughan and Porter. Mr. Tilghman, by deed thereon endorsed dated May 1st 1838, granted the same to Messrs. Vaughan, Porter, Dundas, Nixon, and Kugler, and the survivor and survivors of them, and the heirs of the survivors or survivor, in trust to and for the same uses, intents, and purposes, and with the same and like powers and authorities as said Vaughan and Porter had and held the same. John Barclay, who was to have been a party to the deed of April 27th 1808, that was executed by his co-trustee John Nixon, refused to join in that or any other conveyance of the legal estate, and died intestate on August 8th 1816, leaving children, of whom John M. Barclay was the eldest son, and heir at common law. Shortly after the passage of the laws giving our courts equity jurisdiction, a bill in equity was filed in the Supreme Court for the Eastern District of Pennsylvania, March Term 1841, No. 1, wherein Messrs. Vaughan, Porter, Dundas, Nixon, and Kugler, the then managers, were complainants, and John M. Barclay, eldest son and heir at law of John Barclay, deceased, was defendant, and a decree passed for the plaintiffs. See Vaughan *v.* Barclay, 6 Whart. 390.

In conformity with this decree Mr. John M. Barclay, on the 21st April 1841, executed a deed to the complainants, which deed is recorded in Northampton county in Pennsylvania. When the suit was brought it was assumed by complainants, and so charged, that the law in the Southern States, relative to the

descent of trusts, was similar to that of England and Pennsylvania, and its correctness as an averment of fact was impliedly admitted by the respondent, who by his answer placed his main defence upon the ground that he "as heir at law" of his father, and consequently the one on whom the law had cast the trust, had by writing duly executed renounced the same. It appeared, however, that both parties were mistaken in this assumption of fact, and that in the Southern States the trust descended to all the children of the trustee in the same manner as a beneficial interest; and as the conveyance from the respondent was so drawn as to pass merely his estate as heir at law of his father, the deed was inoperative, and induced the necessity of further proceedings.

Accordingly, on December 23d 1843, Messrs. Dundas and Kugler, the surviving trustees (Messrs. Porter, Vaughan, and H. Nixon having died in the mean time), filed a bill in equity in the Supreme Court, Eastern District of Pennsylvania, to December Term 1843, No. 4, against all the heirs of John Barclay, deceased, to obtain a conveyance to complainants of the legal estate that had been vested in the defendant's ancestors as surviving trustee under the original grant, and in conformity with the articles of agreement and amendments thereto; and on defendants coming in with their answer, and the parties being heard, the court decreed the conveyance, and the defendants accordingly executed to the complainants five deeds dated June 17th 1845, one for each of the states where the lands lay, except Pennsylvania; and each deed is recorded in the appropriate state, except the deed for the North Carolina lands which is not yet recorded. The account of the surviving trustees, running from 1808 to 1856, was filed January 27th 1856, and was by the court below referred to J. A. Phillips, Esq., as auditor, to report distribution of the assets. The fund for distribution, which amounted to $92,071.87, arose in part from sales of the equitable estate of some of the lands of Pennsylvania, made several years ago by former trustees, and in part from sales of lands in other states, made by the present trustees since their acquisition of the legal title. No objection was made to any of the credits claimed by the accountants, nor was any attempt made to surcharge the accountants: the only objection affecting them was in respect to their commission, which they claimed should be equal to 15 per cent. on the sum of money received by them.

The auditor's report was finished January 19th 1860, and filed of record. To the confirmation of this report numerous exceptions and supplementary exceptions were filed for many of the persons interested in the fund as distributees, including the present appellants.

On a partial hearing, March 30th 1860, the report was recom-

mitted to the auditor, with directions to report to the court on or before May 16th 1860 the various items of evidence which were submitted to him, and " upon which, the parties excepting rely for sustaining their exceptions," to be pointed out by them in detail to the auditor and classified, which was done.

The facts of the case were very numerous and complicated, the exceptions equally so, and the testimony presented to the auditor and reported by him to the court exceedingly voluminous.

On final hearing, the auditor's report was corrected by the court by reducing the commissions allowed by the auditor (viz., 8 per cent.) to the sum of $7000, which had been already paid to the accountants, annulling so much of the report as awarded a specific sum to each of the shareholders, and directing payment out of the entire fund to the persons named in the schedule of distribution, in the proportion which the number of shares mentioned in the schedule bears to the whole number of shares among which distribution is to be made; and with these corrections the report was confirmed.

Appeals were then entered by Messrs. Moss, Halsey, and others, which were argued together in this court by *Edward S. Lawrence* for Mr. Halsey, and *Ingersoll* for John Moss and others, appellants, and by *W. M. Tilghman, E. Spencer Miller*, and *Edward Waln* for the appellees.

All the material questions involved in the case, and the facts on which they depend, will be found in the opinion of this court, which was delivered, November 3d 1862, by

STRONG, J.—The record in these cases is voluminous, and the exceptions taken to the decree of the court are nearly ninety in number. Yet the real questions raised are few, and, though the facts are complicated, they are not difficult of solution. A notice in detail of the numerous assignments of error would answer no good purpose, and we shall therefore do little more than express our opinion respecting the substantial questions involved.

The fund for distribution arises out of sales of real estate of the North American Land Company, of which the appellants claim to be owners jointly with others. That company was an unincorporated joint stock association, the sole purpose of which was to sell lands conveyed in trust for it by Robert Morris, John Nicholson, and James Greenleaf, and to distribute the proceeds of sales among the shareholders. Each holder of a share of stock was in equity a joint owner with the other shareholders, and a partner as to creditors of the company who were not joint owners. The company was formed by Morris, Nicholson, and Greenleaf, who established fundamental articles of association,

and thereby offered shares to purchasers upon certain defined conditions, and with assured rights. The present is a contest between those who represent Morris and Nicholson and the other shareholders.

Four principal classes of questions are presented. The first is, what rights, if any, were by the articles of association secured to the other shareholders as against Morris, Nicholson, and Greenleaf. The second relates to the claims of Morris and Nicholson as creditors. The third question is, into how many shares the fund for distribution is to be divided; and the fourth relates to the ownership of those shares. We shall examine each in order.

By the twenty-third article of the association, Morris, Nicholson, and Greenleaf, who were then sole owners of the lands, and who by the articles were then offering them to purchasers, agreed that the dividend or dividends on each share should not be less than $6 per annum, and they also covenanted that in case the proceeds of sales should prove insufficient to pay such dividends, they would advance as much money as should be necessary to enable the managers of the company to pay 6 per cent., looking to subsequent sales for reimbursements. They further agreed that, as a security for performance on their part, they would each deposit 3000 shares in the hands of the trustees with a power of sale.

The appellants now contend that this is nothing more than a personal covenant, not running with the property vested in the company; that it is barred by the Statute of Limitations, and that the covenantors may now participate in the distribution of the fund and take it away from the other shareholders, who bought on the faith of the twenty-third article, as though that article had no existence. This cannot be. Undoubtedly there was a covenant; and even had there been no more, it would by no means be clear that the covenantors could escape from its obligation now. The Statute of Limitations has no possible applicability to it, and it is far from being clear that the circumstances of the case do not forbid any legal presumption of payment arising from lapse of time. The covenant imposed an annually recurring obligation, an obligation as long-lived as the association itself. But however this may be, the twenty-third article was more than a personal covenant. It was a fundamental regulation for distribution, an organic law of the association, stamped upon the deed of settlement by the founders themselves. It was required to be embodied in every certificate of stock, and the right of each purchaser of shares to 6 per cent. annual dividends out of the sales of the lands of the company was secured by the same instrument, and was as indestructible by time as was his right to the land or to the share. Dividends were but distributions of the thing which the shareholders jointly

owned, for they were to be made out of the sales, and it was made the duty of the managers of the company to distribute annually to each shareholder at least $6, a duty imposed by Morris, Nicholson, and Greenleaf themselves, and which they bound themselves to enable the managers to perform.    By the law of their association, they said to the purchaser of every share, "in the distribution you shall receive the stipulated sum annually, and we incorporate the engagement into the articles as well as into the evidence of your title."    Under these very articles the appellants claim now, and their claim necessarily concedes all the rights which the articles guaranteed to other shareholders. They cannot themselves claim under the articles and at the same time mutilate them by striking out the twenty-third section.  By no acts of theirs can they deprive those who obtained certificates from them of the right to receive out of the funds of the company the dividends which the fundamental articles assured.

Nor is there any force in the argument that the twenty-third article of the association was avoided by disuse and non-claim for a long period of years.  It is not founded in fact.  No dividend has ever been made, when those who obtained shares from the founders of the association neglected to claim the benefit of the original rule of distribution.    The neglect of the managers to sue on the covenant of Morris, Nicholson, and Greenleaf, cannot affect the rights of the individual stockholders when distribution comes to be made.    And besides, a resolution was passed by the managers on the 4th of February 1808, reciting the indebtedness of Morris and Nicholson, and prohibiting transfers or payments of dividends on their shares, whether held in their names or in trust for them by others.  In 1807 shares deposited.to secure payment of dividends were sold under an allegation that the covenantors were in default, and the auditor has found as a fact that it was always clearly understood and intended that all the shareholders should be first paid their arrears of dividends at 6 per cent. per annum, under the original agreement, before the shares held by or on behalf of Morris and Nicholson should receive anything.

We think it clear, therefore,. that in the distribution the shares of stock held by Morris, Nicholson, and Greenleaf should be postponed until the other shareholders have received their arrears of the guaranteed 6 per cent. dividends.

The second class of questions in these cases relates to claims of Morris and Nicholson as creditors of the North American Land Association.

It is claimed that John Nicholson was a creditor to the amount of $1706, for money alleged to have been advanced by him to the company to enable it to pay dividends.  The claim is without any foundation.  The only evidence submitted that any such sum was ever advanced is derived from the books of the company;

and those books, instead of exhibiting John Nicholson as a creditor, show a very considerable balance of indebtedness against him.

Again, it is claimed that there is due from the company to Robert Morris, or to those who represent him, the sum of $7684.90, with interest from January 1st 1801. Here, too, the evidence relied on is found in the books of the company. Morris appears to have advanced a large sum to enable the payment of sundry accounts, and also for the payment of dividends. All was refunded to him, however, except the sum of $7684.90, a sum less than he had advanced on the dividend account. That advancement was of course made in compliance with the obligation assumed by him in the twenty-third fundamental article of the association. Now were it conceded that the 6 per cent. guaranty could be presumed satisfied after twenty years, it is too obvious to require argument, that money advanced in pursuance of it cannot be recovered back, so long as the sales of the lands of the company were insufficient to pay the stipulated annual dividends. That they were insufficient ever after 1801 is not denied, and consequently this claim is without any substantial basis, and it would be worthless even if the 6 per cent. guaranty were wiped out by a legal presumption of payment. That can never undo what has been done. The same presumption which would destroy the liability of Robert Morris, would annihilate his claim.

The next question is, what is the number of shares into which the fund is to be divided? According to the original plan of association, Morris, Nicholson, and Greenleaf were to convey in trust, for all who might become holders of the stock, 6,000,000 of acres of land. That body of land constituted the property, and it was to be represented by 30,000 shares of stock as it was called. But, in fact, not quite three-quarters of the 6,000,000 of acres were ever conveyed. The most valuable part, including the lands in Pennsylvania, were never legally vested in the trustees for the use of the company. Consequently only 22,365 shares were issued, one-third to each of the founders. Of the lands unconveyed, some were sold by Morris and Nicholson and some were encumbered. Only a small part was ever saved to the company, and to save that part, and remove the encumbrances, the expenditure of large sums of money became necessary. As an equivalent for 40,000 acres sold by Morris and Nicholson, on the 22d of April 1800 they entered into an agreement with the company to be charged 20,000*l.* Pennsylvania currency, which they agreed should be deducted out of their dividends, meaning, of course, what might thereafter be divided to them, for at that time they were entitled to no past dividends. A claim to any portion of the unissued shares while these sums remain unpaid, with the interest upon them, has no foundation

in equity. Without entering into this subject at length, we content ourselves with remarking that the views expressed by the auditor upon this part of the case meet our entire approval. At best, the claim of the appellants is but a shadowy equity, and is not to be enforced against the other shareholders until complete equity has been done to them. We hold, therefore, that only the number of shares at first issued, namely, 22,365, are to be regarded in the distribution.

Of these original shares Morris, Nicholson, and Greenleaf deposited with the trustees for the company, in compliance with the twenty-third article of association, 7455, with a power of sale, to secure the annual payment to the shareholders of at least a 6 per cent. dividend. They were subsequently sold and purchased for the benefit of the company. If that sale was valid under the power, these shares are virtually extinguished. We think it was a valid sale. At least, claiming as the appellants do under it, it is not for them now to impeach its validity. The auditor has also found that 800 of the remaining shares have been released to the company. This leaves the number of shares actually in existence, either in law or in equity, and entitled to participate in the distribution, 14,110. Of these, however, 215 stand in the names of Robert Morris and John Nicholson, and the dividends to which they are entitled are much more than balanced by the large indebtedness of the holders.

We agree, therefore, with the auditor, that the number of shares upon which a dividend can be claimed is 13,895; and of these even, 541 stand in the name of James Greenleaf. If, as we have seen, the 6 per cent. guaranty is to be satisfied before he could participate in the distribution, these shares should have been excluded. But the only appeals are in right of Morris and Nicholson, and to them the exclusion of Greenleaf's representatives would avail nothing. It is not for their interest as joint owners that the money should be appropriated to the satisfaction of the 6 per cent. guaranty. The only persons who might complain are silent.

The next questions in order relate to the ownership of these 13,895 shares. On the books of the company they stand in the names of numerous persons to whom certificates have been issued as shareholders. As among themselves the holders may be considered legal owners. Under the articles of association, the shares were transferable only at the office of the company on the surrender of the certificates, and new ones were required to be issued to the transferee. The articles also required that a record should be kept of all transfers, thus making the certificates and the books of the company the primary evidence of ownership. Very rightly, therefore, did the auditor distribute the fund

among those who by the books and the certificates appear to be the legal owners of the shares.

The appellants insist that many of the holders of the shares obtained them from Morris and Nicholson merely to sell as agents, and that in equity the ownership remained unchanged by the transfers. It may be so. The evidence tends strongly to prove that such is the fact. But the present holders are something more than mere agents. The legal ownership was given to them. If, as seems probable, it was only to enable them to sell for the benefit of Morris and Nicholson, they hold as trustees. And those trusts are entirely distinct from this which is now in process of settlement. To attempt to enforce them now would result in much confusion, and might work great injustice. Many of the parties are abroad, and have no actual notice of this distribution. Even though but trustees, they may have a claim on the shares for expenses incurred, or advances made. No injustice is done by awarding the fund to the legal owners, and such is the course which in similar cases has generally been adopted. The appellants may then call upon their trustees to account to them, if they can show that any trust or agency exists.

The most important question in this branch of the case relates to what is called the 381 trust. The appellants claim that 6119 shares which stand in the name of that trust, in reality belong to them in equal proportions, and they rest their title upon articles of agreement made on the 28th day of May 1796, between Greenleaf of the one part, and Morris and Nicholson of the other. By these articles it was agreed that Greenleaf should sell to Morris and Nicholson his whole interest in the North American Land Company, consisting of 10,000 shares, for the sum of $1,150,000, payable one half in drafts of Morris on Nicholson accepted by him, and the other half in drafts drawn by Nicholson on Morris, and accepted. The drafts were made payable one, two, three, and four years from date. The articles stipulated that the stock agreed to be sold should not be transferred, but should be retained by Greenleaf until the drafts should mature and be paid, with a proviso that on the payment of a part a proportional part of the stock should be transferred. By the agreement also, Morris and Nicholson covenanted to indemnify Greenleaf, and keep him harmless from any claim or responsibility for interest or dividends on shares of the land company, to which he had made himself liable by the original plan of association.

It is now contended that the 6119 shares are a part of what Greenleaf undertook to sell. Were it important to the question under consideration, it might be doubted whether the whole of these shares could have been within the provision of the contract.

7 WR.—3

What was agreed to be sold was Greenleaf's whole interest, and that was defined to be 10,000 shares. The parties evidently referred to Greenleaf's whole original interest, which was 10,000 shares, and which the contract stipulated was to be paid for as so many shares. This construction is strengthened by the fact that the articles required Greenleaf to obtain retransfers to himself of such part of the 10,000 shares as did not then stand in his name. Of these 10,000 shares agreed to be sold, 2545 were unissued, because Morris and Nicholson had not conveyed all the lands, and 2485 were deposited as a security for dividends. There remained, then, but 4970 shares instead of 6119, to make up the entire number agreed to be sold. It is not important, however, to dwell upon this.

The articles of May 28th 1796 did not amount to a transfer of the legal title to the shares. At most they constituted but an executory agreement, and the appellants are now in effect asking a decree for its specific execution. Sixty years have elapsed since the contract was made. It would be too late to offer to do equity now, and ask the court to interfere. Yet had the acceptances given for the purchase-money been paid in due time, no doubt equity would regard the transfers as having been made, and treat Morris and Nicholson as the owners of the stock. Nor would their rights be at all affected by the assignment which Greenleaf made to George Simpson in trust for the holders of the acceptances, which is called the 381 trust. The assignee merely succeeded to the position of Greenleaf. He held the stock as Greenleaf had held it, only for the protection of the holders of the acceptances given for the purchase-money. He held it with notice of the rights of Morris and Nicholson, and he and his successors would have been bound to execute transfers when the acceptances were paid. Greenleaf could create no trust in the property which would last longer than the interest which he himself possessed. And Mr. Dundas, who it is claimed succeeded George Simpson in the 381 trust, is in no better position than Greenleaf would be in had he never made the assignment. We do not quite agree with the auditor that the legal holders of these shares gain anything against Morris and Nicholson by an adverse holding for more than fifty years. Their holding never was adverse. It commenced with a recognition of the rights acquired under the agreement of May 28th 1796, and nothing has since occurred to change its character. Nor can Morris and Nicholson be said, in any important sense, to claim under the 381 trust. Certainly not so as to compel the concession to the holders of the drafts of any greater rights than they would have held if the assignment to Simpson had never been made. The trust was not of their creation.

We repeat, then, that Mr. Dundas has precisely the same

right to hold the 6119 shares, legally vested in the 381 trust, that Greenleaf would have, had he retained them, and were he still living, and no more. Then how would stand the case between Morris and Nicholson and Greenleaf? As already said, the agreement of the latter to transfer the stock was executory. The only equitable right which Morris and Nicholson could have to demand the stock must have arisen out of payment. Nothing less could ever have entitled them to specific performance. In fact they never did pay. It is not pretended that they did, unless indirectly through what is called the aggregate fund deed. And after a careful investigation we have been unable to discover any evidence that the drafts were ever actually paid, or in any manner satisfied; but if they were, the effect would be to entitle that trust to the stock as against the 381 trust, and on its settlement Morris and Nicholson could assert their rights. For the present, however, it is sufficient to say that the evidence of actual payment of the acceptances utterly fails.

It has been argued that recovery on the acceptances is barred by the Statute of Limitations; that they are therefore to be considered as paid in law, and hence that Greenleaf, or whoever may stand in his place, ceased to have any right to retain the stock, which it is said was pledged to secure them. To this it may be answered: First, that the want of equity in Greenleaf or the legal holder is not the material question. It is Morris and Nicholson who ask the court's interposition, and they must show an equity in themselves. Secondly, this is not the case of a pledge. It may be that if a thing be pledged to secure the payment of a debt, the pledgor may recover it from the pledgee after the debt has been barred by the Statute of Limitations, or presumed to be paid from lapse of time. There are some authorities to that effect. But the agreement between Greenleaf and Morris and Nicholson is in no just sense a pledge. It is neither more nor less than an executory contract to sell, called so by the parties, and incapable of any other construction. Now are there any cases to be found in which a chancellor was moved to decree specific performance in favour of a covenantee, where he had not complied with his engagements, but had remained quiescent until he had been discharged by lapse of time? Was ever such a foundation for an equity successfully set up? No such authority has been shown to us, and I know of none. I cannot see what equity such a covenantee can have. An equity in a party which grows out of his own default or laches is certainly a rarity.

And were it conceded, what would it avail Morris and Nicholson? The entire dividend on the 6119 shares would be absorbed in the debts due by them to the company, and in the claims of the other shareholders under the 6 per cent. guaranty, and still these debts and claims would be far from satisfied. In no aspect

of the cases, therefore, can a dividend upon these shares be made to the appellants.

There remains but one other exception to the decree of the court below.  It is said there was error in the allowance of counsel fees.  They were not awarded for professional services rendered to the accountant as distributee, but for services in the execution of the trust; for services in which all the shareholders had an equal interest.  The allowance was therefore right.  And besides, all parties assented that the auditor should make the allowance.  It is not for a shareholder now to object, especially for one who cannot participate in the distribution.

We have thus briefly but sufficiently reviewed all the exceptions taken to the decree of the court below.  None of them are sustained.  It may be that in the distribution Greenleaf's estate has obtained an undue advantage, but if so, those who have been injured by it do not complain, and the appellants, under no admissible mode of marshalling the fund, could obtain any portion of the money.

The decree of the Court of Common Pleas is affirmed. with costs.

WOODWARD, J., dissented from so much of the above opinion as admits Greenleaf's estate to any share of the distribution; considering that it should have been excluded on the same principle as the estates of Morris and Nicholson; and that the representatives of these estates were entitled to object to the admission of Greenleaf's estate.